UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40224-NMG

```
                                    )
MARIA RODRIGUEZ, Individually       )
And as Administratrix of the Estate )
Of Jose Rodriguez,                  )
              Plaintiff             )
                                    )
     v.                             )
                                    )
VICTOR MONTALVO and                 )
CARMEN SOLIS                        )
              Defendants            )
_____)
```

## MEMORANDUM OF DEFENDANT CARMEN SOLIS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant Carmen Solis respectfully submits this memorandum in opposition to the Motion of Plaintiff, Maria Rodriguez, individually and as administratrix of the estate of Jose Rodriguez ("Plaintiff"), for a Preliminary Injunction.

### FACTUAL AND PROCEDURAL BACKGROUND

Rodriguez/Cabrerra Tenancy At Salem Street. On or about December 12, 1998, Plaintiff, along with her boyfriend Jorge Cabrerra ("Mr. Cabrerra") and Plaintiff's two daughters, moved into the first floor apartment located at 47 Salem Street, Fitchburg, Massachusetts (the "Apartment.") Co-defendant Victor Montalvo ("Mr. Montalvo") allowed Plaintiff to move in immediately and without signing a written lease because Mr. Cabrerra (a former tenant of Mr. Montalvo's) told Mr. Montalvo that Plaintiff needed a first-floor apartment where Plaintiff could bring her handicapped son, Jose Rodriguez ("Jose"), to visit on alternating weekend visits. (Apparently, at this time, Jose was living in an institutional setting.)

Mr. Montalvo agreed to allow Plaintiff and Mr. Cabrerra to move in immediately.
Thereafter, when Mr. Montalvo asked Plaintiff and Mr. Cabrerra to sign a written lease, they
refused to do so. Nonetheless, Mr. Montalvo did not immediately attempt to evict Plaintiff or Mr.
Cabrerra.

From the start of the tenancy, Plaintiff used a portable ramp to transport Jose in and out of
the Apartment when he made his weekend visits. In fact, Mr. Montalvo lent tools to Mr. Cabrerra
to put together the portable ramp. At this time, Mr. Montalvo suggested that Mr. Cabrerra and/or
Ms. Rodriguez remove the side railing to direct the ramp away from interfering with the shared
driveway. Mr. Cabrerra said that would be too expensive to construct, so he did not want to do
that.

Sometime before July 2000, Mr. Montalvo went to the Apartment to speak to Plaintiff and
Mr. Cabrerra about increasing the rent. During this visit, Mr. Montalvo noticed that Plaintiff had
installed a satellite dish into the vinyl siding of the house. When he noticed this, Mr. Montalvo told
Plaintiff that she could not make alterations to the premises without his prior approval. He did not,
however, require Plaintiff to remove the dish. By letter dated July 27, 2000, Mr. Montalvo notified
Plaintiff that he was increasing the rent from $550/month to $600/month and confirmed the
discussion regarding the satellite dish.

Ms. Rodriguez and Mr. Cabrerra responded by objecting to the rental increase and telling
Mr. Montalvo that they were not going to pay him additional rent. Mr. Montalvo sent another letter
dated September 4, 2000 regarding a rental increase. In response, and sometime in October 2000,
Plaintiff and Mr. Cabrerra told Mr. Montalvo that they were vacating the Apartment by the end of
the month. Consequently, Mr. Montalvo began looking for a new tenant and spoke to another
individual, Amy Batchelder, about renting the Apartment for $750/month. (He also discussed with

2

Ms. Batchelder the issue of installing a ramp for her daughter.) Ultimately, Plaintiff and Mr.

Cabrerra did not vacate the Apartment but stayed and continued in their refusal to enter into a lease

agreement.

In early June 2001, Mr. Montalvo told Mr. Cabrerra that he intended to increase the rent to

$750/month, given that this was comparable to area rentals, and again asked Mr. Cabrerra and Ms.

Rodriguez to enter into a written lease agreement. It was at this time that Mr. Cabrerra said that he

wanted to blow out the back wall of the building to install a door and concrete ramp. Mr. Montalvo

responded that this was not a feasible renovation due to the fact that the driveway serving the

Apartment (which also served as parking space) was shared with the building next door and,

consequently, such a renovation would cause problems for the other tenants of Salem Street as well

as the neighbors. Mr. Montalvo also said that he was unsure as to whether the wall could be

removed (for example, was it a load-bearing wall.) Mr. Montalvo also reminded Mr. Cabrerra that

they needed to get his consent to any major renovations, use a licensed, insured contractor rather

than attempting the renovations themselves, and be responsible for returning the premises to their

prior state at the end of the tenancy. Mr. Montalvo did not agree to undertake any renovations or

make arrangements for same.

Mr. Montalvo confirmed the above conversation by letter dated June 8, 2001. It is this

letter that Plaintiff has now relied on to maintain protracted litigation against Mr. Montalvo.

Notwithstanding Plaintiff's attempts to characterize Mr. Montalvo as a heartless person, Mr.

Montalvo has always made it clear that he was willing to work with Ms. Rodriguez and Mr.

Cabrerra to make the building handicap-accessible if they agreed to return the building to its

original condition at the end of the tenancy and so long as the alterations did not cause a hardship

for the neighbors and others using the driveway.

3

Plaintiff and Mr. Cabrerra, unfortunately, did not reciprocate Mr. Montalvo's efforts to be reasonable. For instance, during her time at the apartment, Plaintiff refused to allow Mr. Montalvo to enter the Apartment to make repairs, and moved additional people into the Apartment without notice to Mr. Montalvo. (At one time, there were an additional 5 people living in the Apartment.) On or about July 2, 2001, after Mr. Montalvo was denied access to the Apartment, he received notice from the Board Of Health regarding violations Plaintiff was alleging. Mr. Montalvo attempted to gain access to the apartment on July 4, 2001 to make repairs and was told to leave. He was denied access again on July 5th and July 6, 2001. He was only allowed access to the apartment after Jeffrey Stevens from the Board Of Health contacted Plaintiff. Thereafter, the repairs were completed within the allotted time.

By letter dated September 27, 2001, Mr. Montalvo notified Plaintiff that he was terminating the tenancy at will. A constable served this letter in hand to Plaintiff's daughter at the Apartment on September 29, 2001.

The MCAD Conference And Additional Attempts To Accommodate Plaintiff. The very next day, Plaintiff filed a Complaint with the Massachusetts Commission Against Discrimination,[1] alleging that Mr. Montalvo (and Lori Oltman[2]) violated M.G.L. c. 151B, § 4 ¶ 4A, 6, 7A and 42 U.S.C. § 3601 and 3604 by refusing to make a reasonable accommodation to the apartment to accommodate Jose's disability.

The MCAD held an investigative conference on November 7, 2001. At that conference, Mr. Montalvo's then counsel, Vincent Pusateri, Jr., presented Plaintiff (through her counsel) with a Predetermination Agreement in accordance with 804 CMR 1.15(1). Mr. Montalvo will testify at

---

[1] Plaintiff's original complaint included Jorge Cabrerra as a co-plaintiff. In an Amended Complaint, Plaintiff removed Mr. Cabrerra's name from the Complaint and added Jose Rodriguez as a Plaintiff.

[2] Plaintiff alleges that Lori Oltman, Mr. Montalvo's girlfriend, was a manager of the apartment building.

4

trial that, in response to being handed that Agreement, Plaintiff's counsel said "This isn't about a ramp, it's about money. You better contact your insurance company" Plaintiff's counsel also said, referring to Mr. Montalvo, that he "intend[s] to bury him in legal fees."

Attorney Pusateri's testimony corroborates that of Mr. Montalvo. Specifically with respect to the MCAD investigative conference, Attorney Pusateri will testify that, when he gave Plaintiff's counsel the Predetermination Agreement, Plaintiff's counsel folded his arms, leaned away and said something to the effect that the case had gone beyond the installation of the ramp and was now a monetary issue. Obviously, the case did not resolve at the conference.

Even more compelling is Attorney Pusateri's testimony of his subsequent discussions with Plaintiff's counsel. According to Attorney Pusateri, through January and February 2002, he and Plaintiff's counsel had discussions regarding both a lift and a ramp. Through correspondence, Attorney Pusateri (on behalf of Mr. Montalvo) authorized several different proposals. For instance, in a January 14th letter to Plaintiff's counsel, Attorney Pusateri authorizes a *lift* that Plaintiff had proposed. Then, by letter dated February 12, 2002, Attorney Pusateri told Plaintiff's counsel that Plaintiff was authorized to construct the *ramp* they proposed if they did not agree with Mr. Montalvo's proposal, essentially giving Plaintiff the green light to go ahead and construct what she wanted to construct.

By the Spring of 2002, no ramp or lift had been constructed. In or about Spring 2002, Attorney Pusateri had a telephone conversation with Plaintiff's counsel. During that conversation, Attorney Pusateri pointed out the existence of a company called "USA Ramp," which he believed at the time rented ramps for handicapped persons. Attorney Pusateri expressed to Plaintiff's counsel his concern that a ramp had not been installed in light of the previous authorizations. Plaintiff's counsel indicated to Attorney Pusateri that he felt that things were held up in Plaintiff's

counsel's office and that, consequently, it was important to get the case settled. Unfortunately, once again, there was no resolution.

Filing Of Federal Lawsuit. Jose passed away on June 11, 2002. Less than two months later, on July 29, 2002, Plaintiff commenced an action in this Court against Mr. Montalvo and Lori Oltman, alleging the same violations that were alleged before the MCAD, and further alleging a claim of intentional infliction of emotional distress. Ms. Rodriguez's intentional infliction claim is based on her allegations that she was forced to endure Jose being transported in and out of the Apartment without a proper ramp.

Attachment Of Montalvo Real Estate. On January 12, 2004, this Court granted Plaintiff's Motion To Attach Real Estate, ordering an attachment in the amount of $75,000 of any real estate held in the name of Victor Montalvo. Plaintiff recorded this writ on January 21, 2004. At the hearing on Plaintiff's Motion, and in Mr. Montalvo's Opposition to said Motion, the Court did not have the benefit of the above-referenced facts regarding the multiple attempts to accommodate Plaintiff, Plaintiff's subsequent failure to install a ramp or lift and Plaintiff's apparent preference to pursue litigation rather than make the various different renovations that she requested.

The Mount Pleasant Avenue Property. Mr. Montalvo first bought the property located at 30 Mount Pleasant Avenue, Leominster, Massachusetts (the "Mount Pleasant Avenue Property" or the "Property") in 1994 with his then-wife, Tracy Montalvo. Both he and his mother, co-defendant Carmen Solis ("Mrs. Solis"), will testify at trial that Mrs. Solis lent some money to Mr. Montalvo and his wife so that they could purchase the Property. (Mr. Montalvo recalls that the amount of this loan was over $5,000, although Mrs. Solis does not recall the amount.)

In 1999, Mr. Montalvo and his wife divorced and, as part of their divorce settlement, Tracy Montalvo was to receive $5,000. (The equity in the home at the time was determined to be about

6

$10,000.) The $5,000 consideration is recited in the relevant deed in which Tracy Montalvo conveyed her interest in the Property.

*Mrs. Solis paid this $5,000* – which at the time represented a one-half interest in the Property -- *to Tracy Montalvo*. In addition, *in March 2001 – long before any litigation was commenced -- Mrs. Solis assumed the mortgage on the Property along with Mr. Montalvo*. (A copy of the Assumption Agreement with Mrs. Solis' signature is attached to Mr. Montalvo's affidavit as Exhibit G.)

At the time the Assumption Agreement was signed, both Mrs. Solis and Mr. Montalvo were under the impression that the bank would take care of deeding the property to Mrs. Solis. (This understanding was reasonable given the language of the Assumption Agreement, which states that the Property will be conveyed to Mr. Montalvo and Mrs. Solis.) For reasons unknown, however, this did not happen. When Mr. Montalvo discovered in February 2003 that the Property was still in his sole name, a deed was executed conveying the Property to Mr. Montalvo and Mrs. Solis together.

In May 2003, Mr. Montalvo transferred his interest in the Mount Pleasant Avenue Property to Mrs. Solis. At this point, both Mr. Montalvo and Mrs. Solis understood that the transfer was made in satisfaction of various loans that Mrs. Solis had previously made to Mr. Montalvo. Consequently, Mrs. Solis understood at that point that the Property belonged to her. This transfer was also made in contemplation of Mrs. Solis, who was at the time approaching retirement, moving to Massachusetts.

Unfortunately, Mrs. Solis' medical problems prevented her from realizing her plans to move into the Property. Mrs. Solis suffers from various medical conditions, including sleep apnea, high blood pressure, irritable bowel syndrome and sarcoidosis (which affects her bones and lungs.)

She also has lost a kidney and has the use of half of her remaining kidney. In addition, she has had problems with her knees and, consequently, her mobility is severely limited. Due to these medical conditions, Mrs. Solis' doctor advised her against moving to Massachusetts and suggested that she move to a warmer climate. Consequently, Mrs. Solis decided to move to Arizona to live instead and she, in fact, made this move on June 9, 2004. Because she obviously was not going to live in the Property, it was sold.

Mrs. Solis sold the Property on approximately May 28, 2004 and received almost $73,000 from the sale. Of that $73,000, she has spent almost $13,000. This money was spent on moving expenses, including plane tickets. She also used the money to buy items for her apartment, including a television, stereo, kitchen table, chairs and a hutch. The remaining proceeds of $60,183 are currently held in her savings account at Washington Mutual. Ultimately, Mrs. Solis hopes to use this money to contribute to the purchase of a condominium.

Mrs. Solis is now retired and renting an apartment in Arizona. She is 63 years old. Her only sources of income currently are her Social Security benefits of about $976 monthly and her pension of about $1,800 monthly. Given her age and medical issues, this fixed income -- along with Mrs. Solis' savings, or what she is allowed to retain after this matter -- are quite likely her only sources of income for the rest of her life.

## LEGAL STANDARD

To prevail on her request for a preliminary injunction freezing any proceeds of the sale and mortgage of the Property,[3] Plaintiff must establish (1) a likelihood of success on the merits of her claims, (2) the existence of irreparable harm absent an injunction, (3) that the hardship to Plaintiff if

---

[3] Plaintiff also requests that the Court order Defendants to provide an accounting the sale and mortgage proceeds. The Court ordered same in its November 4, 2004 Order. Mrs. Solis has provided said accounting in her affidavit submitted herewith.

8

an injunction does not issue outweighs the hardship to Mrs. Solis if an injunction does issue, and

(4) that the Court's action is in the public interest. Matos v. Clinton School District, 367 F.3d 68,

73 (1st Cir. 2004). A consideration of any one of these elements – and certainly a consideration of

all elements together – suggests that this Court should deny any request that Mrs. Solis be

prohibited from using any part of the sale proceeds from the Property.

### ARGUMENT

### I.  PLAINTIFF DOES NOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF HER CLAIMS, AND CERTAINLY NOT A LIKELIHOOD SUFFICIENT TO JUSTIFY A RESTRAINT ON THE ENTIRE AMOUNT OF THE SALE PROCEEDS.

Not only is there compelling evidence that the Property was not fraudulently conveyed to

Mrs. Solis, but the evidence concerning Plaintiff's underlying discrimination claims suggests that

Plaintiff will not recover damages sufficient to justify the relief requested here.

### A.  The Evidence Establishes That Plaintiff Will Not Likely Prevail On Her Fraudulent Conveyance Claim, Because The Property Was Conveyed To Mrs. Solis For Reasonably Equivalent Value.

Plaintiff will have the burden of proving at trial that Mr. Montalvo fraudulently conveyed

the Mount Pleasant Avenue Property. That is, she will have to prove either that Mr. Montalvo

transferred the Property (1) "with actual intent to hinder, delay, or defraud any creditor" or (2)

"without receiving a reasonably equivalent value in exchange for the transfer or obligation, and

[that Mr. Montalvo] (i) was engaged or was about to engage in a business or a transaction for which

the remaining assets of the debtor were unreasonably small in relation to the business or

transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would

incur, debts beyond his ability to pay as they became due." See M.G.L. c. 109A, § 5. Accord

M.G.L. c. 109A, § 6(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a

creditor whose claim arose before the transfer was made or the obligation was incurred if the

9

debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.").[4]

Under the UFCA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." See M.G.L. c. 109A, § 4(a). Determining whether fair value was given does not require an exact dollar-for-dollar accounting of the value of the transfer versus the value of the antecedent debt. Rather, the Court should look to whether the exchange was reasonably equivalent. See In re O'Day Corp., 126 B.R. 370 ((D. Mass. 1991) (Debtor may receive "fair equivalence" for alleged fraudulent conveyance even if consideration received is not exactly equivalent in value to property transferred or obligation assumed; reasonable equivalence, rather than exact equivalence, is all that is required.); Bianco v. Lay, 313 Mass. 444 (1943) ("'Fair equivalent' . . . does not mean that adequacy of consideration is to be determined by weighing value of goods sold and price received in very precise scales or by any ratio of proportion."); F&M Schaefer Brewing Co. v. Moebs, 187 Mass. 571 (1905) ("A conveyance by a debtor of property worth $4,100 to his sons in consideration of $2,600 in cash and money due them from the debtor was not fraudulent because of the difference between the value and price."). Also, in determining the adequacy of consideration under this

---

[4] Plaintiff alleges in her Memorandum Of Reasons that (i) Mrs. Solis is an "insider" pursuant to M.G.L. c. 109A, § 2 and (ii) the transfers complained of were made after Plaintiff commenced the Fair Housing Act Action. Plaintiff is apparently attempting to avail herself of the option of establishing a fraudulent conveyance pursuant to M.G.L. c. 109A, § 6(b), which provides that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." Plaintiff cannot pursue her claim under Section 6(b), however, because this claim is barred by the applicable statute of limitations. M.G.L. c. 109A, § 10(c) provides that "[a] cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought . . . under subsection (b) of section six, within one year after the transfer was made or the obligation was incurred." The transfers complained of here occurred in February and May of 2003. Plaintiff did not bring this action until October 28, 2004.

section, the Court must look to whether a fair price was paid for the transfer, not to what the transferee ultimately realized at a later sale. In re Morse Tool, Inc., 148 B.R. 97 (D. Mass. 1992).

Here, the evidence establishes that the February 2003 transfer to Mrs. Solis of a one-half interest in the Property was made not only for a "reasonably equivalent value," but for essentially the precise dollar value. That is, Mrs. Solis paid to Tracy Montalvo the sum that was determined (during Mr. Montalvo's divorce proceedings) to represent Tracy Montalvo's interest in the Property. In addition, Mrs. Solis (along with Mr. Montalvo) assumed the mortgage on the Property. The Assumption Agreement – which was signed long before Plaintiff commenced even the underlying discrimination matter -- itself states that Mr. Montalvo and Mrs. Solis will be the owners of the Property. Although for some reason a deed was not drafted at that time conveying the Property to Mr. Montalvo and Mrs. Solis, it is reasonable that the two understood that this was going to happen, given the language of the Assumption Agreement. Mrs. Solis should not now be punished financially because the deed was not actually executed and recorded until February 2003.

The May 2003 transfer of Mr. Montalvo's one-half interest in the Property to Mrs. Solis, thus making her the sole owner of the Property, was also made for fair consideration. Although admittedly neither kept records of the loans Mrs. Solis made to Mr. Montalvo, both will testify at trial that Mrs. Solis lent significant sums of money to Mr. Montalvo and that it was Mr. Montalvo's intention to repay those loans with the May 2003 transfer. Mrs. Solis understood that, upon this transfer, the Property was hers and she made plans in reliance on that transfer. More importantly, this transfer was made in exchange for antecedent debts – which the statute itself recognizes as value - and in contemplation of Mrs. Solis moving into the Property to spend her retirement years. Unfortunately, when medical problems made that move impractical, the Property was sold. The

fact that Mrs. Solis' medical issues did not allow to move into the Property, however, should not

prevent her from now using the proceeds from that Property to make a life for herself in Arizona.

**B.    The Evidence Of Mr. Montalvo's Repeated Attempts To Accommodate Plaintiff -- And Plaintiff's Insistence On Pursuing Litigation For An Apparent Ulterior Motive -- Casts Serious Doubt On The Likelihood Of Plaintiff Recovering Damages After A Trial Of Her Underlying Discrimination Claims.**

Plaintiff's underlying discrimination claim alleges that Mr. Montalvo violated the Federal

Fair Housing Act, 42 U.S.C. § 3604, as well as the corresponding state fair housing laws.  As this

Court is aware, the Fair Housing Act prohibits

> a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises, except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification.

See 42 U.S.C.A. § 3602(f)(3)(A).  That is, Plaintiff will prevail only to the extent that she can show

that Mr. Montalvo refused a modification of the Apartment that was reasonable and necessary to

afford Jose full enjoyment of that Apartment.  See id.  Accord M.G.L. c. 151B, § 4(7A)(1).  Even if

liability is established, Plaintiff's damage flow from the unreasonable refusal to allow

modifications.  Id.

Consequently, at the trial of the underlying discrimination claim, a critical issue will be the

period of time over which the requested modifications were refused.  Mr. Montalvo's testimony, as

described more fully above, establishes that he was more than reasonable in his attempts to

accommodate Plaintiff and it was Plaintiff who chose not to make certain modifications.  There is

also compelling evidence that Plaintiff's actions were reactive to reasonable and appropriate

requests to increase the rent for the Apartment.  Plaintiff of course disputes these facts and a jury

will ultimately have to make a determination of liability.

Extremely compelling, however – indeed, virtually irrefutable – is the evidence that, no later than February 2002, Plaintiff was authorized to make the modifications that she proposed. Nonetheless, while Plaintiff apparently claims that the absence of a ramp was distressing to herself and her son, those modifications were never made. Nonetheless, Plaintiff commenced the underlying action in July 2002 and seeks to hold Mr. Montalvo – and now Mrs. Solis – responsible for her inaction.

This Court, in the underlying discrimination matter, previously determined that Plaintiff was reasonably likely to prevail on her discrimination claims and found that a reasonable figure for Plaintiff's anticipated recovery was $50,000 in compensatory damages and $25,000 for fees and costs. See January 12, 2004 Memorandum And Order. In reaching its conclusion, this Court did not have the benefit of the above-referenced facts concerning Mr. Montalvo's repeated offers to accommodate Plaintiff, which offers were ignored in favor of litigation. These facts are critical to a determination of whether the requested injunction should issue at all, and certainly the facts establish that a $60,000 restriction is not justified.

## II.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVORS DENIAL OF THE REQUESTED INJUNCTION.

Plaintiff's allegations (in her Memorandum Of Reasons) that the balance of equities favors Plaintiff because Mrs. Solis has engaged in acts of fraud is entirely groundless and without merit. There is simply no evidence of any fraudulent intent on the part of Mrs. Solis. More importantly, the balance of equities and the public interest actually favors denial of the injunction requested here. Mrs. Solis gave fair consideration for her interest in the Property and relied on the fact that the Property was hers in exchange for her loans to Mr. Montalvo. She will likely rely on the proceeds from the sale of that Property in the remaining years of her life, inasmuch as those years will likely and unfortunately include excessive medical expenses. If the requested injunction is issued, this

13

money will be unavailable for at least as long as it takes the parties to complete the litigation of this

matter and the underlying discrimination claim. The possibility that Mrs. Solis will, in the future,

will not be financially self-sufficient deals a grave injustice to Mrs. Solis and cannot possibly be in

the interest of the public.

## CONCLUSION

For the foregoing reasons, Mrs. Solis respectfully requests that this Court deny the

Plaintiff's Motion For Preliminary Injunction.

CARMEN SOLIS,

By her Attorney,

Janie Lanza Vowles
BBO# 637022
RONCONE LAW OFFICES
142 Main Street
Leominster, MA 01453
(978) 534-2444

Dated: May 18, 2005