UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40224-NMG

|  |  |
|---|---|
| MARIA RODRIGUEZ, Individually<br>And as Administratrix of the Estate<br>Of Jose Rodriguez,<br>　　　　Plaintiff<br><br>v.<br><br>VICTOR MONTALVO and<br>CARMEN SOLIS<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF VICTOR MONTALVO**

I, Victor Montalvo, do hereby depose and state the following:

1. On or about December 12, 1998, Plaintiff Maria Rodriguez ("Ms. Rodriguez"), along with her boyfriend Jorge Cabrerra ("Mr. Cabrerra") and her two daughters, moved into the first-floor apartment of the building that I own at 47 Salem Street, Fitchburg, Massachusetts (the "Apartment.")

2. I allowed Ms. Rodriguez to move in immediately and without signing a written lease because Mr. Cabrerra (a former tenant of mine) told me that Ms. Rodriguez needed a first-floor apartment where Ms. Rodriguez could bring her handicapped son, Jose Rodriguez ("Jose"), for alternating weekend visits. (Apparently, at this time, Jose was living in an institutional setting.)

3. I agreed to allow Ms. Rodriguez and Mr. Cabrerra to move in immediately. Thereafter, when I asked Ms. Rodriguez and Mr. Cabrerra to sign a written lease, they refused to do so. Nonetheless, I did not attempt to evict Ms. Rodriguez or Mr. Cabrerra right away.

1

4.     From the start of the tenancy, Ms. Rodriquez used a portable ramp to transport Jose in and out of the Apartment. I lent tools to Mr. Cabrerra to put together the portable ramp. At this time, I suggested that they remove the side railing to direct the ramp away from interfering with the shared driveway. Mr. Cabrerra said that would be too expensive to construct, so he did not want to do that.

5.     Sometime before July 2000, I noticed that Ms. Rodriguez had installed a satellite dish into the vinyl siding of the house. (I was living upstairs at the time.) When I noticed this, I told Ms. Rodriguez that she could not make alterations to the premises without my prior approval. I did not, however, require Ms. Rodriguez to remove the dish.

6.     By letter dated July 27, 2000, I notified Ms. Rodriguez that I was increasing the rent from $550/month to $600/month and confirmed the discussion regarding the satellite dish. A copy of that letter is attached hereto as Exhibit A.

7.     Ms. Rodriguez and Mr. Cabrerra responded by objecting to the rental increase and telling me that they were not going to pay me additional rent.

8.     I then sent another letter dated September 4, 2000. A copy of that letter is attached hereto as Exhibit B.

9.     In October 2000, Ms. Rodriguez and Mr. Cabrerra told me that they were vacating the property by the end of the month. Lori Oltman mentioned to a co-employee, Amy Batchelder, the Apartment was available for $750/month. Thereafter, I spoke to Amy Batchelder and she told me she was interested in renting for that price. I also discussed with Ms. Batchelder the issue of installing a ramp for her daughter.

10.    I then sent another letter dated October 12, 2000. A copy of that letter is attached hereto as Exhibit C.

11. Ultimately, Ms. Rodriguez and Mr. Cabrerra did not vacate the Apartment but stayed and continued in their refusal to enter into a lease agreement.

12. In early June 2001, I told Mr. Cabrerra that I intended to increase the rent to $750/month, given that this was comparable to area rentals, and again asked Mr. Cabrerra to enter into a written lease agreement.

13. It was at this time that Mr. Cabrerra informed me that she intended to blow out the back wall of the building by installing a door and concrete ramp. I told Ms. Rodriguez that this was not a feasible renovation due to the fact that the driveway serving the Apartment (which also served as parking space) was shared with the building next door and, consequently, such a renovation would cause problems for the other tenants of 47 Salem Street as well as the neighbors. I also told him that I was unsure as to whether the wall could be removed (for example, was it a load-bearing wall.) A diagram showing the shared driveway is attached hereto as Exhibit D.

14. I also told Mr. Cabrerra that they needed to get my consent to any major renovations, use a licensed, insured contractor rather than attempting the renovations themselves, and be responsible for returning the premises to their prior state at the end of the tenancy. I did not agree to undertake any renovations or make arrangements for same. (At some point, I also suggested a lift (that is, a ramp that could be lifted when not in use) that would not obstruct the driveway and parking area.)

15. I confirmed this conversation to Mr. Cabrerra by letter dated June 8, 2001. A copy of that letter is attached hereto as Exhibit E. I have always made it clear that I am willing to work with Ms. Rodriguez and Mr. Cabrerra to make the building handicap accessible if they agreed to return the building to its original condition at the end of the tenancy and so long as the alterations did not cause a hardship for the neighbors and other prospective tenants using the driveway.

16. During their time at the apartment, Ms. Rodriguez and Mr. Cabrera refused to allow me to enter the apartment to make repairs, and moved additional people into the apartment without notice to me or my consent. (At one time, there were an additional 5 people living in the apartment.)

17. After being denied access to the property, and on or about July 2, 2001, I received notice from the Board Of Health regarding violations Ms. Rodriguez and Mr. Cabrera were alleging. I attempted to gain access to the apartment on July 4, 2001 to make repairs and was told to leave. I was denied access again on July 5th and July 6, 2001. I was only allowed access to the apartment after Jeff Stevens from the Board Of Health contacted Ms. Rodriguez. Thereafter, the repairs were completed within the allotted time.

18. Shortly thereafter, Ms. Rodriguez complained that a replacement stove that I had just installed was not working. In response to this Complaint, and on August 13, 2001, Mr. Stevens and I went to inspect the stove and found that it was working fine.

19. I also received threats from Ms. Rodriguez and Mr. Cabrerra, including threats of bodily harm when I asked Mr. Cabrerra to remove a vehicle that was improperly stored on the premises.

20. By letter dated September 27, 2001, I notified Ms. Rodriguez that I was terminating the tenancy at will. A constable served this letter in hand to Ms. Rodriguez's daughter at the Apartment on September 29, 2001. Copies of that letter and the constable's return of service are attached hereto as Exhibit F.

21. I understand that, the next day, Ms. Rodriguez filed a Complaint against me with the Massachusetts Commission Against Discrimination (the "MCAD").

22. I went to an MCAD conference in November 2001 with my then-attorney, Vincent Pusateri, Jr. At this conference, Attorney Pusateri presented Ms. Rodriguez's counsel, Jonathan Mennina, with a Predetermination Agreement. In response, Attorney Mennina said "This isn't about a ramp, it's about money. You better contact your insurance company" Attorney Mennina also said, referring to me that he "intend[s] to bury him in legal fees."

23. I first bought the property located at 30 Mount Pleasant Avenue, Leominster, Massachusetts (the "Property") in 1994 with my then-wife, Tracy Montalvo.

24. I recall that my mother, Carmen Solis, lent us money to help us purchase the Property. I believe the amount was over $5,000. Tracy and I also had a mortgage with First Eastern Mortgage Corporation.

25. Tracy and I divorced in 1999. There was about $10,000 in equity in the Property at the time and, as part of the divorce settlement, Tracy was to receive $5,000.

26. My mother lent me the $5,000 to buy Tracy out (by paying this amount directly to Tracy.) My mother also assumed the mortgage along with me. She did this by signing an Assumption Agreement. I recently obtained a copy of that Assumption Agreement from my lender. A copy of the deed from Tracy to me (reciting the $5,000 consideration), and the Assumption Agreement is attached hereto as Exhibit G.

27. At the time the Assumption Agreement was signed, I was under the impression that the bank would take care of deeding the property to my mother. I discovered in February 2003, however, that this did not happen and so a deed was done at that time.

28. My mother has lent me a lot of money over the years and we intended for her to live at the Property when she retired. I wanted to be able to pay her back for these loans so I conveyed the entire Property to her in May 2003. We both understood at that point that the house was hers.

5

29. Once my mother learned that she should live in a warmer climate due to her health, arrangements were made to sell the Property.

30. I understand that there is an attachment on the Salem Street Property. About two years ago that Property was appraised at $150,000. The current mortgage balance is $126,000, so I estimate that there is about $25,000 of equity in the Property.

31. My mother, Carmen Solis, does not speak or read English. On May 17, 2005, my mother's attorney, Attorney Vowles, had a phone conference with my mother, during which Attorney Vowles asked my mother various questions for purposes of preparing an affidavit in this matter. I translated Attorney Vowles' questions for my mother and my mother's responses for Attorney Vowles. I understand that Attorney Vowles prepared my mother's affidavit based on this phone conversation, and then faxed a draft of the affidavit to my mother. On May 18, 2005, I spoke to my mother over the phone, translated the affidavit to her and confirmed that it was accurate. My mother then signed the affidavit and faxed the signature page to Attorney Vowles.

Signed under the pains and penalties of perjury on this 18th day of May, 2005.

*/s/ Victor Montalvo*
Victor Montalvo